MICHAEL A. JACOBS (CA SBN 111664)
THOMAS J. PARDINI (CA SBN 313401)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, CA  94105-2482
Telephone:  (415) 268-7000
Facsimile:  (415) 268-7522
mjacobs@mofo.com; tpardini@mofo.com

BENJAMIN J. FOX (CA SBN 193374)
RYAN J. MALLOY (CA SBN 253512)
SOO J. PARK (CA SBN 300988)
MORRISON & FOERSTER LLP
707 Wilshire Boulevard, Suite 6000
Los Angeles, CA  90017-3543
Telephone:  (213) 892-5200
Facsimile:  (213) 892-5454
bfox@mofo.com; rmalloy@mofo.com;
spark@mofo.com

Attorneys for Plaintiff/Defendants
QUIBI HOLDINGS, LLC, WNDRCO
HOLDINGS, LLC, QBI HOLDINGS, LLC,
NEW QBI, LLC, JEFFREY KATZENBERG,
CLIFTON L. SMITH, JR., JOSEPH
BURFITT, ROBERT A. POST, JR., ERIC
BUEHL, and BLAKE BARNES

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| QUIBI HOLDINGS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>INTERLUDE US, INC. d/b/a EKO; and JBF INTERLUDE 2009 LTD. – ISRAEL,<br><br>Defendants, | Case No.:  2:20-CV-02250-CAS-SK<br><br>**DECLARATION OF JIM C. WILLIAMS IN SUPPORT OF QUIBI'S PROPOSED CLAIM CONSTRUCTIONS**<br><br>Judge:      Hon. Christina A. Snyder |

| | |
|---|---|
| 1 | JBF INTERLUDE 2009 LTD and INTERLUDE U.S., INC., d/b/a EKO, | Case No.: 2:20-CV-02299-CAS-SK (CONSOLIDATED) |
| 2 | |
| 3 | Plaintiffs, |
| 4 | v. |
| 5 | QUIBI HOLDINGS, LLC, WNDRCO HOLDINGS, LLC, QBI HOLDINGS, LLC, NEW QBI, LLC, CLIFTON L. SMITH, JR., JOSEPH BURFITT, ROBERT A. POST, JR., BLAKE BARNES, ERIC BUEHL, AND JEFFREY KATZENBERG, |
| 6 | |
| 7 | |
| 8 | Defendants. |
| 9 | |
| 10 | |

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................... 1

II.  PERSONAL BACKGROUND ................................................................ 1

III. OVERVIEW OF MATERIALS CONSIDERED ..................................... 4

IV.  LEGAL PRINCIPLES ............................................................................ 5

V.   LEVEL OF ORDINARY SKILL IN THE ART ...................................... 5

    A.   Level of Ordinary Skill in the Art for '220 Patent ....................... 5

    B.   Level of Ordinary Skill in the Art for '066 Patent ....................... 6

    C.   Level of Ordinary Skill in the Art for '765 Patent ....................... 6

VI.  THE PATENTS-IN-SUIT ........................................................................ 7

VII. THE CLAIM TERMS IN DISPUTE ....................................................... 9

    A.   "video presentation" ('765 patent) ............................................... 9

    B.   "resized" ('765 patent) ............................................................... 18

    C.   "media player window" ('765 patent) ......................................... 24

    D.   "range" ('765 patent) ................................................................. 29

    E.   "segment" ('220 and '066 patents) ............................................. 35

    F.   "collection of segments" ('220 patent) ....................................... 42

    G.   "decision points" ('220 patent) .................................................. 46

    H.   "content paths" ('066 patent) ..................................................... 48

i

## I.     INTRODUCTION

1.     I have been retained by counsel for Quibi as a technical expert in this matter.  I make this declaration in support of Quibi's proposed claim constructions. I understand that Interlude US, Inc. d/b/a Eko; and JBF Interlude 2009 Ltd. – Israel (collectively, "Eko") have accused Quibi of infringing the below-listed claims of the below-listed U.S. patents (collectively, the "patents-in-suit").[1]

| U.S. Patent No. | Asserted Claims | Filed; Earliest Application Date |
|---|---|---|
| 10,460,765 (the '765 patent) | 1-18 | 8/26/2015 |
| 8,600,220 (the '220 patent) | 1-2, 5-14, 17-21 | 4/2/2012 |
| 10,418,066 (the '066 patent) | 1-5, 7, 11-15, 17 | 12/30/2015; 3/15/2013 |

2.     I have been asked to consider and render opinions on the proper constructions of certain terms of the patents-in-suit.  All statements in this declaration are based on my own personal knowledge, unless stated otherwise.  All the opinions expressed in this declaration are my own.  This declaration is subject to amendment and/or supplementation on the basis of information that may be made available to me in the future.

## II.     PERSONAL BACKGROUND

3.     I am an expert in the fields of media and entertainment distribution and consumption technologies, including capture of content, coding of video and associated audio, communications engineering including broadcast and Internet streaming, consumer reception device engineering, television engineering, and

---

[1] I understand that Eko claims priority to the listed dates.  I will assume, for purposes of this Declaration that the patents are entitled to the listed dates, but I have performed no analysis here to determine if they are entitled to these dates.

displays engineering relevant to understanding the present matter. I have studied, practiced, and researched in this field for over 35 years. I summarize in this section my educational background, work experience, and other relevant qualifications. Attached hereto as Exhibit A is a copy of my current Curriculum Vitae (CV).

4.      I am the owner/principal of Media Strategies and Solutions LLC ("MediaSandS"), which provides consulting services. I currently serve as President and Founder of MediaSandS. My consultancy works with clients to define and implement new media distribution and product strategies with special focus on technology, business, copyright protection, and regulatory matters. Further, I work as a technology expert in litigation.

5.      I received a Bachelor of Science degree in Engineering from the University of California, Los Angeles, and a Master of Science degree in Electrical Engineering from California State University, Long Beach.

6.      I have delivered more than 45 addresses on five continents at conferences, summits, fora and other engagements relating to displays, television, and entertainment technologies. I am a named inventor on fifteen issued U.S. patents, as well as numerous foreign patents, in the field of film, television, video distribution, compression, transmodulation, and anti-piracy technologies. A listing of my publications, speaking engagements and patents is contained in my attached CV (Exhibit A).

7.      I have received over ten awards for contributions to media technology and engineering, including five Technology and Engineering Emmy Awards and an Advanced Media Technology Emmy Award, jointly with other members of the respective development teams. A listing of these awards is contained in my attached CV.

8.      I have more than 35 years of experience in film, television, and video technologies research, development, design, engineering, operations, testing and manufacturing. I am highly proficient in digital television technologies.

2

9.     For example, I was a regular participant in MPEG standards meetings from 1991 to 1997 representing my company in the American (ANSI) standards and the United States in international standards.  At times, I served as the head of the United States delegation to the parent group of the MPEG working group, i.e., ISO/IEC JTC1 SC29.

10.    Prior to founding MediaSandS, I held various positions at the Motion Picture Association of America, Inc. ("MPAA").  I served as Vice President of Television & Video Systems from 2002-2007, and then as Senior Vice President & Chief Technology Officer from 2007-2010.  During my time at the MPAA, I led efforts to facilitate a smooth transition to digital technology, including digital television standards work with ATSC, CEA (now CTA), DVB, and similar organizations in the United States and around the world.

11.    Before my time at the MPAA, I held various positions at DIRECTV, Inc., leading the business start-up of DIRECTV Japan, the launch of the first US nationwide HDTV service, and DIRECTV's first receiver development team. Specifically, I served as Director/Senior Manager of Multi-user Systems from 1995-1997, Director of the Japan Enterprise Startup Team from 1997-1998, Director of the HDTV Program from 1998-1999, and Director of Product Development from 1999-2001.  My positions at DIRECTV typically involved oversight of engineering teams and, in some cases, broader teams including engineering, broadcast operations, sales, programming, customer service, IT, finance, legal and public relations personnel.  I led the HDTV business start-up for DIRECTV, working with our MPEG-2-based HDTV broadcast encoder manufacturer and multiple MPEG-2-based HDTV consumer electronics manufacturers as they developed their initial DIRECTV HDTV televisions and receivers, which were also ATSC-compliant.  I specifically worked with all stakeholders, including content providers and television manufacturers, to define the resolutions and aspect ratios for the end-to-end content distribution chain of this

1    early HDTV system.  I led DIRECTV's set-top box development activity when

2    DIRECTV decided to take control of their middleware and hardware platforms,

3    forming and leading a team of 70 engineers.

4         12.    Prior to DIRECTV, I worked for its parent company, Hughes

5    Electronics.  From 1982 to 1991, I was a hardware, software and chip designer in

6    an organization that was a leader in Navy and air traffic control workstations having

7    1280x1024 (within HD range) and 2048 x 2048 (double HD) resolutions,

8    respectively.  Among other systems, I designed the display engines for these

9    workstations.  From 1991-1995, I led research and development activities in

10   multimedia technologies for entertainment, security, financial, medical, and

11   command and control business initiatives.

12        13.    Media Strategies and Solutions LLC is being compensated at an hourly

13   rate for my time spent working on this case.  My compensation is not affected by

14   the outcome of this case.

15        **III.    OVERVIEW OF MATERIALS CONSIDERED**

16        14.    In reaching the opinions expressed in this declaration, I have reviewed

17   and considered the materials cited in this declaration, including the patents-in-suit

18   and their file histories, the parties' joint claim construction statement and proposed

19   claim constructions, the Court's order denying Eko's preliminary injunction, and

20   Eko's opening claim construction brief, Declaration of Dr. Chatterjee, and the

21   accompanying exhibits.  I have also relied on my own education, experience, and

22   expertise in media and entertainment distribution and consumption technologies

23   relevant to understanding the patents at issue, including capture of content, coding

24   of video and associated audio, communications engineering including broadcast

25   and Internet streaming, consumer reception device engineering, television

26   engineering, and displays engineering.  I have also considered other extrinsic

27   evidence, as cited herein.

28

4

## IV.   LEGAL PRINCIPLES

15.    I understand that to construe claim terms, courts first look to intrinsic evidence:  (1) the patent claims; (2) the specification; and (3) the prosecution history.  The words of a claim are generally given their ordinary and customary meaning, which is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention.  This person of ordinary skill in the art must read the claim term in the context of the entire patent, including the specification.  The patent's prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, narrowing the claim scope.  Courts also may use extrinsic evidence, like dictionaries, treatises, and expert or inventor testimony, to resolve ambiguities in the disputed claim terms.  But I understand that extrinsic evidence is less significant than the intrinsic record in determining the legally operative meaning of claim language.

## V.   LEVEL OF ORDINARY SKILL IN THE ART

16.    I understand that U.S. patent law interprets patents and prior art from the perspective of a person of ordinary skill in the art ("POSITA") at the time of the priority date of a patent.  I further understand that some factors used to determine a person of ordinary skill in the art include:  (1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field.

### A.   Level of Ordinary Skill in the Art for '220 Patent

17.    I understand that in support of an IPR petition regarding the '220 patent, Dr. Don Turnbull has opined that "a POSITA in the context of the technology claimed in the '220 patent would be a person with a bachelor's degree (or equivalent) with coursework or independent study in Computer Science, Computer Engineering, Information Systems, Information Studies, Electrical

Engineering, or a related technical field, and two years of experience working with multimedia client/server systems, including software for displaying and interacting with multimedia or video; or a person with a master's degree (or equivalent) with coursework or independent study in one of the above fields. Alternatively, a POSITA would have five to six years of experience working with multimedia client/server systems, including software for displaying and interacting with multimedia or video." IPR2020-01549, Ex. 1002. I agree with Dr. Turnbull.

### B. Level of Ordinary Skill in the Art for '066 Patent

18. Based on my analysis of one or more of the above factors and on my own personal experience in the field, a POSITA in the context of the technology claimed in the '066 patent would have a bachelor's degree (or equivalent) in electrical engineering, computer engineering, computer science, or a related technical field, and two years of experience in digital audiovisual systems; or a person with a master's degree (or equivalent) with coursework or independent study in one of the above fields. Additional education in a relevant field, or relevant industry experience may compensate for a deficiency in one of the other aspects of the requirements stated above.

### C. Level of Ordinary Skill in the Art for '765 Patent

19. Based on my analysis of one or more of the above factors and on my own personal experience in the field, a POSITA in the context of the technology claimed in the '765 patent would have a bachelor's degree (or equivalent) in electrical engineering, computer engineering, computer science, or a related technical field, and two years of experience in digital audiovisual systems; or a person with a master's degree (or equivalent) with coursework or independent study in one of the above fields. Additional education in a relevant field, or relevant industry experience may compensate for a deficiency in one of the other aspects of the requirements stated above.

20.     By each of the standards above, as of the priority dates of each of the patents-in-suit, I met or exceeded the qualifications of a POSITA.  I should note that the construction of terms is not likely to be sensitive to minor variations in the level of ordinary skill in the art.

## VI.     THE PATENTS-IN-SUIT

21.     The three patents-in-suit each relate to streaming and playback of digital, interactive audiovisual programming, each covering different areas:

22.     Claim 1 of the '765 patent recites:

A computer-implemented method comprising:

identifying one or more properties associated with a user device;

receiving video from a first video presentation;

receiving, simultaneously with the video from the first video presentation, video from a second, different video presentation;

configuring a first state of the video from the first video presentation based on at least one of the properties associated with the user device;

presenting the video from the first video presentation according to the first state;

providing a mapping of video presentations to media player window height ranges and media player window width ranges; and

during playback of the video from the first video presentation:

determining that a media player window in which the video is playing has been resized to change from first dimensions comprising a first height and a first width to second, different dimensions comprising a second height and a second width;

determining that the second height is included in a particular one of the media player window height ranges;

determining that the second width is included in a particular one of the media player window width ranges;

evaluating the mapping to determine that the second video presentation is mapped to both the particular media player window height range and the particular media player window width range; and

7

1  in response to the evaluating, seamlessly transitioning from the video from the first video presentation to the video from the second video presentation based on the change.

2

3  23.  Claim 1 of the '220 patent recites:

4  A system for facilitating the selective presentation of video content, wherein the video content is comprised of a collection of segments, the system comprising:

5

6  a video loading manager for selectively determining a subset of the collection of segments to download, wherein the determination is based, at least in part, on a download priority.

7

8  24.  Claim 1 of the '066 patent recites:

9  A system comprising:

10  a memory for storing a plurality of multimedia content segments, each content segment defining a portion of one or more content paths, wherein a particular content segment comprises a decision period during which a subsequent content segment can be selected for playback as the particular content segment is playing;

11

12

13  an assembly engine for seamlessly assembling a subset of the content segments into a multimedia presentation comprising one of the content paths;

14

15  a configuration manager for determining an audio file and a video file to be played based on a selected subsequent content segment:

16

17  an audio engine for:

18  dividing the audio file into a plurality of audio samples, each audio sample comprising a timestamp indicating a time at which the audio sample should be played; and

19

20  upon causing one of the audio samples to be played, updating a current playback time based on the timestamp of the played audio sample, wherein the current playback time comprises a time that is maintained separately from timestamps of the audio samples and identifies a most recently played audio sample; and

21

22

23  a video engine for synchronizing playback of the video file with playback of the audio file based on the current playback time.

24

25  25.  The '765 and '066 patents each incorporate the '220 patent (or its application) by reference.

26

27

28

8

26.     In the section below, I analyze the terms in dispute from the perspective of a POSITA and render my opinions regarding their proper constructions.

## VII.   THE CLAIM TERMS IN DISPUTE

### A.     "video presentation" ('765 patent)

| Term | Quibi's Construction | Eko's Construction in Joint Statement (Dkt. 355-1) |
|---|---|---|
| "video presentation" '765 Patent, claims 1, 3-10, 12-18 | "independent video presentation not comprising a region of a larger-dimensioned video" | Plain and ordinary meaning, which is "visual media content that may have audio and/or other media associated with it" |
| | | **Eko's Construction in Claim Construction Brief (Dkt. 435)** |
| | | Plain and ordinary meaning, which is "visual media content displayed to a user on a user device and may have audio and/or other media associated with it" |

27.     I understand that Quibi proposes that the term "video presentation" should be construed to mean "independent video presentation not comprising a region of a larger-dimensioned video."  I also understand that Eko proposes that the term should be given its plain and ordinary meaning, which Eko now asserts is "visual media content displayed to a user on a user device and may have audio and/or other media associated with it."  A person of ordinary skill in the art would understand Quibi's proposed construction to be consistent with the '765 patent claims and Eko's description of its claims from the prosecution history.

28.     Asserted claims 1 and 10 of the '765 patent require "receiving video from a first video presentation," simultaneously receiving "video from a second, different video presentation," "determining that a media player window . . . has

been resized to change . . . dimension[s]," evaluating a mapping of height and width ranges, and "seamlessly transitioning from the video from the first video presentation to the video from the second video presentation based on the change." The claim language, by describing "a second, different video presentation," suggests that these are independent video presentations.  In addition, claims 8, 9, 17, and 18 each claim modifying or changing various properties "between the videos."  "Videos" is plural, communicating to a POSITA that the first and second video presentations are referring to switching between two separate videos.

29.    Further, independent claims 1 and 10 can be distinguished from claims 5 and 14, which claim "configuring the first state of the video from the first video presentation" by "setting a viewing region of the video from the first video presentation to a partial area of the video from the first video presentation."  This process of "setting a viewing region of the video" must be different from claim 1 and 10's transitioning from "video from a first video presentation" to "video from a second, different video presentation."

30.    I found in my review of Eko's prosecution history that the prosecution history strongly supports Quibi's proposed construction.  Quibi's proposed construction follows Eko's own statements during prosecution of this patent, in which it distinguished its claims from the prior art reference referred to as "Kasai." Because I believe Dr. Chatterjee and Eko misrepresent or selectively quote this prosecution history, I give a full accounting of it below.

31.    Eko's patent application originally did not contain any disclosures or claim limitations containing "first video presentation" or "second, different video presentation."  (*See, e.g.*, Jacobs Decl. Ex. 1 at EKO0001154.)   Independent claims 1 and 11 referred instead to configuring "a first state of the video" based on properties, "presenting the video according to the first state," and "transitioning the video to a second state" based on a change in properties.  (*Id.*)  Claims 9, 10, 19, and 20 all referred to changing or modifying properties "of the video," in singular

10

form.  (*Id*., EKO0001155-1157.)  But the examiner rejected all of Eko's claims in the '765 patent application "as being anticipated by US 20120147954 A1 to Kasai et al. (hereinafter 'Kasai')."  (*Id*., EKO0001817.)

32.    Kasai is directed to the delivery of high-definition video, and "relates to technology for delivering video corresponding to an arbitrary viewing region[] that has been designated at the receiving device side."  (Jacobs Ex. 6, Kasai, [0001].)  This is accomplished by "accumulating a plurality of image bit streams" into an "image bit stream group accumulating unit (40)."  (*Id*., Abstract.)  The receiving device transmits viewpoint information defining a first area.  Then, an image bit stream corresponding to the first area, and an image bit stream corresponding to a second area peripheral to the first area, are transmitted to the receiving device.  (*Id*., [0019].)  Kasai explained that "a plurality of bit streams corresponding to regions specified by the viewpoint information 213b are extracted from the video bit stream group storage section 40, and transmitted to the client 2." (*Id*., [0064].)  This means that "even in the case when viewing position at the receiving device side moves, . . . it is not necessary to newly acquire a corresponding video bit stream from the transmission device."  (*Id*., [0023].) Below is Kasai's Figure 1 illustrating this process.



Transmission system schematic drawing

33.    In response to the examiner's Kasai rejection, Eko distinguished its claims from Kasai.  According to Eko, Kasai described a video delivery technique "in which a video is divided into different regions with corresponding video bit streams," and both regions are transmitted "allowing the user to transition his region of interest among areas of the larger video."  (Jacobs Ex. 1, EKO0001860.) Eko described Kasai as "focus[ing] on a <u>single</u> video presentation, and allowing a user to switch his viewing area among regions of that single presentation."  (*Id*. (emphasis in original).)  This, according to Eko, "is not the same as seamlessly transitioning from video from a first video presentation to video <u>from a second, different video presentation</u> upon that change in a property associated with a user device, as claimed by Applicant."  (*Id*. (emphasis in original).)  Eko then amended its claims to add the limitations related to the "first video presentation" and "second, different video presentation," and amended the dependent claims from "of the video" (singular) to "between the videos" (plural), to otherwise make clear that

it was discussing the receiving of two independent videos.  (*Id*. at EKO0001862-1866.)  The examiner rejected Eko's distinction and the amended claims, again in view of Kasai.  (*Id*., EKO0001876.)

34.    Eko responded by repeating its position and clarifying its explanation as to why its claims differed from Kasai.  Eko repeated all the arguments that I described above.  (*Id*., EKO0001907.)  In addition, Eko asserted that for its own claimed "video presentations," "[e]ach video presentation is an ***independent video presentation not comprising a region of a larger-dimensioned video***."  (*Id*., EKO0001906 (emphasis added).)  Eko again stated that Kasai "is not the same as seamlessly transitioning from video from a first video presentation to video from a second, different video presentation . . . 'wherein each of the first video presentation and the second video presentation is an ***independent video presentation not comprising a region of a larger-dimensioned video***.'"  (*Id*., EKO0001907 (emphasis in original).)  Eko also amended its independent claims to add this same language as a claim limitation.  (*Id*., EKO0001901-1903.)

35.    Eko's arguments helped convince the examiner.  The examiner agreed with Eko that "Kasai fails to teach wherein each of the first video presentation and the second video presentation is an independent video presentation not comprising a region of a larger-dimensioned video."  (*Id*., EKO0001934.)  However, the examiner found that a different prior art reference called Gunter *did* teach this proposed limitation.  (*Id*., EKO0001935.)

36.    Eko then amended its claims to add multiple limitations directed to resizing a "media player window" (discussed further below).  As Eko added these distinctive limitations in the claims, it removed "wherein each of the first video presentation and the second video presentation is an independent video presentation not comprising a region of a larger-dimensioned video" as a proposed limitation.  However, Eko retained its previously-added limitations about a "first video

presentation" and a "second, different video presentation." (*Id.*, EKO0001960-1969.)  Eko's patent application was approved and the '765 patent was issued.

37.   In view of this prosecution history, a POSITA would conclude that the claimed "first video presentation" and "second, different video presentation" must be different, independent, separate, and cannot comprise a region of a larger-dimensioned video.  Attempting to overcome Kasai, Eko added these "first" and "second, different" "video presentation" limitations to its independent claims, amended the dependent claims to read "between the videos," and repeated several times that while Kasai was one single video presentation displaying a particular region of that video presentation, Eko's claimed video presentations were each "an independent video presentation not comprising a region of a larger-dimensioned video."  This was a consistent argument.

38.   Eko's expert, Dr. Chatterjee, criticizes Quibi's construction by saying that "nothing in the patent or the file history precludes the video from the two video presentations from being received as, for example, a single file or a single video stream that includes a larger video that is itself never displayed to the user." (Chatterjee Decl. ¶ 29.)  This is incorrect for the numerous reasons described above, including Eko's own statements during prosecution.  Dr. Chatterjee also says that Kasai is unrelated to the '765 patent because it is directed to a different method, system, and solution.  (*Id.*, ¶ 32.)  I disagree that Kasai is unrelated to Eko's patent, and apparently so did the examiner, who found Eko's claims anticipated by Kasai.

39.   Eko's proposed construction is incorrect.  Eko's construction is "plain and ordinary meaning, which is 'visual media content displayed to a user on a user device and may have audio and/or other media associated with it.'"  Dr. Chatterjee uses a dictionary to support that a "presentation" is "something presented." (Chatterjee Decl., ¶ 24.)  Because of this, he explains that his understanding of "video presentation" is "video meant for playback and presentation to a user,"

(Chatterjee Decl., ¶ 25), and that two different video presentations simply mean two different things presented to a user.

40. Eko's construction and Dr. Chatterjee's analysis, which focuses solely on what is presented, does not make sense in the context of claim 1. Claim 1 requires "receiving video from a first <u>video presentation</u>," as well as "presenting the video from the first <u>video presentation</u>." Replacing Eko's construction in these phrases yields: "receiving video from a first <u>visual media content displayed to a user</u>," and "presenting the video from the first <u>visual media content displayed to a user</u>." Thus, Eko's construction requires that the method "receiv[e] video" from a presentation displayed to a user *before* that same presentation is even presented to that user. The "video presentations" of the '765 patent's claims cannot refer simply to what is being presented.

41. Dr. Chatterjee's explanation does not make sense in the context of the specification either. He explains that for situations where the full picture is never viewed, each separate portion is itself a presentation, but the full picture is not. (Chatterjee Decl. ¶ 30 (describing Figures 4A-4D).) On the other hand, "where the larger video *can* be viewed," each separate portion is itself *not* a presentation, but the full picture *is* a presentation. (*Id.*, ¶ 31 (describing Figures 5A-5B).) Dr. Chatterjee's opinion is not supported by either the specification or file history. In the patent specification, the processes of *both* Figures 4 and 5 are described as "viewport" modifications to one video; there is nothing about "video presentations" at all—either switching between them or showing regions of one. In Figure 4A, for example, "a video 400 of a family is provided," where "only a portion of the video 400 is viewable by the user at any point in time during playback," which changes based on "a change in the size and/or position of the viewport." ('765 patent, 6:25-29.) Meanwhile, in Figure 5, "the viewport 510b is modified in size and repositioned" (*id.*, 7:5-6) within "a lecture video 500" (*id.*, 6:61). Both Figures 4 and 5 depict viewports over one larger video. Eko's prosecution statements—

which say each video presentation must be "an independent video presentation not comprising a region of a larger-dimensioned video"—mean that the processes depicted in Figures 4 and 5 do not qualify as switching between two video presentations.  However, each of Figures 4 and 5, by setting a viewport over one video, could qualify as the "configuring a first state of the video from the first video presentation" limitation in claim 1, and would thus not be entirely excluded.  They could further qualify as "configuring the first state of the video . . . ," comprising "setting a viewing region of the video from the first video presentation to a partial area of the video from the first video presentation," as recited in claim 5.



FIG. 4A



FIG. 5B

42.     In contrast to Figures 4 and 5, which depict moving a viewport around one larger video, Figure 3 shows a resizing that results in an entirely different video (not a region of one).  "Different media content can be associated with each fixed window dimension (defined height and width)," and "upon changing from fixed dimensions X to fixed dimensions Y, the video shown in the media player 300 can change from the singer 210 to the band 220."  (*Id.*, 5:57-62.)  For Figure 3, "Table 1 indicates **which of three different videos is presented** depending on current window dimensions."  (*Id.*, 6:3-5.)

1
2
3
4
5
6
7
8
9
10
11



**FIG. 3**

12    43.    I therefore disagree with Dr. Chatterjee that the meaning of a "video

13  presentation" is clearly explained and distinguished between Figures 4 and 5.

14  Figures 4 and 5 depict viewport changes over one larger-dimensioned video, and

15  would both be excluded from Eko's prosecution statements clarifying that the two

16  video presentations described in its claims cannot comprise a region of a larger-

17  dimensioned video.  At most, they can relate to "the first state of the video from the

18  first video presentation." (*Id.*, claims 1 and 5.)  The Figure 3 example, however,

19  with "three different videos" per Table 1 (*id.*, 6:4) that could be presented, could

20  have "independent video presentation[s] not comprising a region of a larger-

21  dimensioned video."  This makes sense in the context of Eko's other claim

22  limitations about "resizing" a "media player window" according to height/width

23  "ranges" (described further below), which are also directed to Figure 3.

24    44.    Accordingly, I agree with Quibi's proposed construction.

25
26
27
28

17

**B.**   **"resized" ('765 patent)**

| Term | Quibi's Construction | Eko's Construction in Joint Statement (Dkt. 355-1) |
|------|---------------------|---------------------------------------------------|
| "resized"<br><br>'765 Patent, claims 1, 10 | "changed in size by an input device (not physically rotated)" | Plain and ordinary meaning, which is "change to any size dimension, such as height and/or width" |
| | | **Eko's Construction in Claim Construction Brief (Dkt. 435)** |
| | | Plain and ordinary meaning, which is "changed in size" |

45.    I understand that Quibi proposes that the term "resized" should be construed to mean "changed in size by an input device (not physically rotated)."  I also understand that Eko proposes that the term should be given its plain and ordinary meaning, which Eko now asserts is "changed in size."  I believe that Quibi's proposed construction accords more closely with the patent claims, specification, and prosecution history.

46.    The '765 patent claims require "determining that a media player window in which the video is playing has been resized to change from first dimensions comprising a first height and a first width to second, different dimensions comprising a second height and a second width," and transitioning to a second video presentation after mapping and evaluating height and width ranges.

47.    The '765 patent consistently explains that "resizing" a media player window is not the same thing as rotating a device.  "Fig. 2 depicts a video state change responsive to a ***rotation*** of a user device," while "Fig. 3 depicts a video state change responsive to a ***window resizing***."  ('765 patent at 2:26-29 (emphasis added).)

1
2
3
4
5
6
7
8
9
10



Figure 2 (annotated)

11
12
13
14
15
16
17
18
19
20
21



Figure 3 (annotated)

22    48.    Eko's specification says that "[a]s shown in FIG. 2, smartphone 200 is

23  rotatable between a portrait mode A and a landscape mode B."  On the other hand,

24  Figure 3 depicts "a windowed media player 300 on a desktop computer, laptop, or

25  other user device supporting windowed applications.  In this instance, ***rather than***

26  ***physically rotating or repositioning the user device, the user changes the window***

27  ***size or state (e.g., minimized, maximized, thumbnailed) of the media player 300***

28  ***using an input device*** (e.g., mouse, keyboard, touchscreen, etc.)."  (*Id*. at 5:47-54

(emphasis added).)  Quibi's proposed construction uses the same words as this description, incorporating both how the resizing occurs through an input device and how it is not satisfied by a mere rotation of the entire device.

49.    Dr. Chatterjee makes much of a particular portion of the patent specification to argue that rotating is the same as resizing.  (Chatterjee Decl., ¶ 38.) In this passage, rotation is taught to sometimes cause a simultaneous resizing of the image to fit the screen, which is not the same as resizing a media player window to transition from one video to another.

> In a typical mode of operation, when a mobile device, such as a smartphone or tablet, is displaying a video, photograph, webpage, or the like, ***rotating the device between portrait and landscape results in a rotation of the item*** displayed on the device screen in order to maintain the orientation of the item while, ***in some cases, simultaneously resizing the item to fit to the current screen proportions***. For example, an image that occupies the entire device screen in landscape mode will retain its orientation when the device is rotated to portrait mode, but is resized so that the width of the image fits within the narrower width of the portrait screen, resulting in mattes displayed above and below the image.

('765 patent, 4:65-5:10, emphasis added.)  Here, the "video, photograph, webpage, or the like," i.e., "item," is resized, not the claimed "media player window in which the video is playing."  Even if the correct item was being resized, which it isn't, the item is rotated as one process, and resized to become smaller as a separate process. It resizes this item to be smaller, with "mattes displayed above and below the image" for a letterboxed presentation, rather than the image taking up the full screen.  This resizing of an image that results from rotation is not the claimed "resiz[ing]" of a media player window, which is depicted in Figure 3.  Dr. Chatterjee is incorrect when he says a POSITA would interpret this as "resizing of the window."  (Chatterjee Decl., ¶ 38.)

50.    Dr. Chatterjee observes that "Quibi appears to be attempting to limit the claims to the embodiment of Figure 3, and attempting to exclude other embodiments such as the smartphones depicted in Figure 2."  (Chatterjee Decl.,

¶ 37.)  It is not Quibi's creation, but the plain language of the claims, Figures 2 and
3, and associated descriptions that exclude Figure 2.

51.    Claims 1 and 10 require "determining that a media player window in
which the video is playing has been resized," with multiple other limitations
directed to this "media player window," so it is correct to construe this term in the
Figure 3 context.  Figure 2 and the text associated with it describe the smartphone
and its associated properties, such as "physical orientation" and "screen resolution,
aspect ratio, display proportions, and physical screen size." ('765 patent, 4:41-49.)
But "window size" is not one of those properties.  The specification contrasts
smartphones with other devices that support windows: "For example, for device
operating systems that support windowed applications (e.g., desktops, laptops,
televisions, or other devices supporting Microsoft Windows ® operating systems or
Apple OS X ® operating systems), one device property can be the window size
(e.g., height and width values) of a media player application (e.g., native
application, browser, or otherwise) . . . ." ('765 patent, 4:55-61.)  A POSITA would
understand this contrast set forth in the specification, because in 2015, the Apple
iOS® and Google Android[TM] operating systems did not support windowed
applications as a POSITA would understand them.[2]  A POSITA would, however,
understand Microsoft Windows ® and Apple OS X ® to be windowed operating
systems, where windows that contain applications can be opened, closed,
minimized, maximized, or resized, e.g., by a user clicking and dragging an edge or
corner of the window.  Such windows could occupy portions of the screen.

52.    This is supported by the Figure 2 and 3 pictures. The thick black bands
at the top of the windows in Figure 3 show that the boxes shown are application
windows (such as found in Microsoft Windows ® and Apple OS X ®).  The bands

---

[2] "Apple iOS®" and "Google Android[TM]" are operating systems commonly
used on mobile devices, like smartphones, and are cited in the specification. ('765
patent, 3:43-44.)

are not visible in Figure 2 because Figure 2 shows a smartphone with full-screen views.  Also, in Figure 2, the screen size in portrait view is the same size as the landscape view (just rotated), because a smartphone does not change size when you rotate it.  In Figure 3, which represents media player windows, the two windows are not the same size (even if rotated).  The window displaying the singer is more square-shaped than the window displaying the band.  This reinforces the point that resizing a media player window is properly directed to Figure 3 and not Figure 2.

53.     Quibi's construction also aligns with the prosecution history.  During prosecution, after several rejections from the Patent Office, Eko added all the "media player window" limitations, including this "resiz[ing]" one.  Eko amended independent claim 1 to change from "determining that a change in at least one of the properties associated with the user device has occurred" to "determining that a media player window in which the video is playing has been resized . . . ," in order to overcome Kasai and Gunter.

> during playback of the video from the first video presentation:
>
>     determining that a media player window in which the video is playing has been resized to change from first dimensions comprising a first height and a first width to second, different dimensions comprising a second height and a second width change in at least one of the properties associated with the user device has occurred;

(Jacobs Ex.1, EKO0001960).  Arguing for the claims' allowance with these "media player window" and "resizing" limitations, Eko cited the specification's discussion of Figure 3 alone.[3]  (*Id.*, EKO0001966-1967.)  As explained above, Figure 3 depicts a "resizing" that explicitly excludes a rotation.  ('765 patent, 5:50-51 ("rather than physically rotating or repositioning the user device . . .")  This supports the fact that the amended and final claim limitation is not referring to a device property like orientation, but instead is limited to the resizing of a media player window playing

---

[3] Applicant cited paragraphs [0032] and [0033], which correspond to '765 patent, 5:57-6:13.

video (as described in the introduction to Figure 3).

54.    Although I understand that extrinsic evidence is not as important to claim construction as the intrinsic evidence (which supports Quibi), dictionary definitions also support Quibi's construction. Oxford English Dictionary ("OED") defines "resize" as "[1.] Originally and chiefly *U.S.* To alter the size of; to make larger or smaller," and "[4.] *Computing*. To alter the size of (an image or window on the screen)." (Jacobs Ex. 3, at QUIBI_0008825-26.) The Microsoft Computer Dictionary (Fifth Edition) accords with these definitions: "To make an object or space larger or smaller." (Jacobs Ex. 2, at QUIBI_0008823.)

55.    These definitions specify that altering or changing the size, within the meaning of "resize," entails making it larger or smaller. By construing "resized" to not include "rotated," Quibi's construction properly excludes something that does not make the media player window of claim 1 larger or smaller. A rotated media player window retains the same dimensions and same total area, and merely swaps the axis that is positioned horizontally with the one that is positioned vertically.[4] The computing definitions also contemplate that a "window" such as the media player window of claim 1 is subject to resizing. This resizing entails "alter[ing] the size of" a window or image.

56.    In light of the foregoing, I agree with Quibi's proposed construction.

---

[4] Of course, the media player window need not be rotated a full 90 degrees, which makes it even clearer that the dimensions of the media player window are not actually changing when it is rotated. Only the way they are labeled may be changed. For example, if one took a PC laptop or MacBook with windows on the display and rotated it on a 45-degree angle, the windows would all remain the same size. If one continued the rotation to 90 degrees, the windows would still remain the same size, but one *might* modify how they described the width and height. Instead, if one used the mouse to grab the corner of a window and drag it to a different place, then the window would be resized, regardless of the orientation of the computer.

## C.   "media player window" ('765 patent)

| Term | Quibi's Construction | Eko's Construction in Joint Statement (Dkt. 355-1) |
|---|---|---|
| "media player window"<br><br>'765 Patent, claims 1, 10 | "a user-resizable rectangular portion of a screen in which media content is displayed" | Plain and ordinary meaning, which is "a window of an application running on a device, such as a computer, smartphone, or tablet, that is capable of presenting (or playing) videos" |
| | | **Eko's Construction in Claim Construction Brief (Dkt. 435)** |
| | | Plain and ordinary meaning, which is "a window of an application running on a device, such as a computer, smartphone, or tablet, that is capable of presenting (or playing) video content" |

57.   I understand that Quibi proposes that the term "media player window" should be construed to mean "a user-resizable rectangular portion of a screen in which media content is displayed." I also understand that Eko proposes that the term should be given its plain and ordinary meaning, which Eko asserts is "a window of an application running on a device, such as a computer, smartphone, or tablet, that is capable of presenting (or playing) video content." Dr. Chatterjee did not opine on this term, so I will base my understanding of Eko's position on Eko's brief.

58.   Quibi's proposed construction of "media player window" is in accordance with the claims, specification, and prosecution history. As discussed and depicted above, Figure 2 and Figure 3 distinguish between two types of processes. Figure 2 refers to a "***smartphone 200*** [that] is rotatable" ('765 patent,

4:64 (emphasis added)), whereas Figure 3 refers to "*a windowed media player 300* on a desktop computer, laptop, or other user device supporting windowed applications" (*id.*, 5:48-50 (emphasis added)). The patent explains that sometimes the "existence of a particular device property depends on the device type" (*id.*, 4:53-54), and proceeds to introduce the concept of "windowed applications" by explaining the contexts in which they would appear—not with smartphones, but with "desktops, laptops, [and] televisions":

> [F]or device operating systems that support windowed applications (e.g., desktops, laptops, televisions, or other devices supporting Microsoft Windows® operating systems or Apple OS X ® operating systems), one device property can be the window size (e.g., height and width values) of a media player application (e.g., native application, browser, or otherwise), or the window state (e.g., minimized, maximized, in thumbnail) of a media player application.

('765 patent at 4:55-63.) This excerpt of the specification indicates that not all device operating systems will support window size as a possible property. Conspicuously excluded from this list are smartphones and tablets, which are listed in other contexts.

59. Quibi's construction incorporates the required elements of the "media player window," as described in the patent claims and specification. Quibi's construction shows that the "media player window" of Eko's '765 patent must be "resizable." In fact, it must be "resizable" *during playback*. Claims 1 and 10 of the '765 patent describe a method that "during playback of the video from the first video presentation: determine[s] that a media player window in which the video is playing has been resized." A software window can be resized during playback, while a physical screen cannot be resized; thus, a "media player window" cannot be equivalent to the physical screen itself. Other claims support this distinction as well. Claim 2 differentiates "physical screen size" from "window size" by reciting both in a long list of possible properties: "The method of claim 1, wherein the properties are selected from the group consisting of physical orientation, model,

25

*physical screen size*, screen resolution, and ***window size***" (emphasis added).  This suggests that "physical screen size" and "window size" are not the same thing.  A POSITA would also understand that a "screen size" is measured in inches and set during manufacturing.  The inches of the screen do not increase or decrease during playback, whereas a window's size, e.g., X pixels by Y pixels, may do so and are thus "resizable."  ('765 patent, 8:54-59 ("one or more device properties, such as . . . screen size = 3 in. x 4.5 in., window size = 1024 pixels x 768 pixels.")

60.   Quibi's construction also includes how the media player window must be resizable by the user.  In the patent's discussion of Figure 3 in the "media player window" context, "***the user changes the window size or state (e.g., minimized, maximized, thumbnailed) of the media player 300 using an input device*** (e.g., mouse, keyboard, touchscreen, etc.).  In some instances, the media player 300 is resizable to fixed dimensions and will 'snap to' the closest size as ***a user resizes the associated window***."  ('765 patent, 5:50-56 (emphasis added).)  Quibi's construction including "user-resizable" aligns with how the media player window is described in the patent, in which the user must operate upon it in order to resize it.

61.   Quibi's construction also includes how the media player window comprises "a portion of a screen."  The specification explains that "one device property can be the window size (e.g., height and width values) of a media player application (e.g., native application, browser, or otherwise), or the window state (e.g., minimized, maximized, in thumbnail) of a media player application."  (*Id.* at 4:55-63.)  A media player window that can be resized, minimized, maximized, and thumbnailed takes up a certain portion of the screen.  Table 1 of the '765 patent shows how "height and width of a particular window can be individually resized to occupy between 5% and 100% of a screen."  (*Id*., 6:2-14.)  The ranges are listed in percentages between 5% and 100%—percentages or portions of the 100% whole—demonstrating that they occupy some portion of the conceptually distinct screen.

| TABLE 1 | | |
|---|---|---|
| Window Height Range | Window Width Range | Video |
| 5% to <50% | 5% to 100% | Video 1 |
| 50% to 100% | 5% to <25% | Video 2 |
| 50% to 100% | 25% to 100% | Video 3 |

Quibi's construction—by describing a "portion of a screen"—is an appropriate and accurate scope of "media player window." In the context of the claims, specification, and common understanding of windowed media players, a POSITA would understand that a media player window would be a rectangular area that comprises a portion of the screen, up to the 100% whole of a "maximized" window. A POSITA would understand that a window could be "minimized" so as to disappear from view and no longer be a displayed window. A POSITA would understand that the 5% lower bound of Table 1 was likely an arbitrary cutoff for smallness of displayable window and would be application-specific.

62. The prosecution history that I pointed out in the context of "resized" also supports Quibi's construction for "media player window." As I explained above, Eko cited to Figure 3 alone, not Figure 2, when adding all of the "media player window" limitations during prosecution to overcome prior art Kasai. Eko cited paragraphs [0032] and [0033], which correspond to 5:57-6:13 of the '765 patent. (Jacobs Ex. 1, EKO0001967-1968.) Figure 3 and its associated description contain the relevant "media player window" disclosures, all of which support Quibi's construction.

63. Eko's proposed construction is incorrect because it includes "smartphones" in the list of possible devices that could include a "media player window." But Figure 2's smartphone rotation does not include "window size" as a possible property. Besides physical orientation, "[o]ther properties of user devices, such as smartphone 200, can include screen resolution, aspect ratio, display

proportions, and physical screen size," but these listed properties do not include "window size." ('765 patent, 4:39-53.)  The operating systems of smartphones would *not* be considered windowed operating systems by a POSITA, and they are specifically contrasted in the specification from operating systems that *do* support windowed applications, such as Microsoft Windows ® and Apple OS X ®.

64.    Quibi's proposed construction properly captures the key aspects of media player window in the context of its description in the specification.  It does not restrict the window to "desktops, laptops, televisions, or other devices supporting Microsoft Windows ® operating systems or Apple OS X ® operating systems," ('765 patent, 4:56-59), but generalizes to the characteristics of media player windows in the context of the specification.

65.    Again, although I understand that extrinsic evidence is less important to claim construction, extrinsic evidence supports Quibi's construction as well. Wikipedia defines "Window (computing)" as "a graphical control element [] consist[ing] of a visual area containing some of the graphical user interface of the program it belongs to and is framed by a window decoration."  (Jacobs Ex. 7, QUIBI_0008865.)  It says that windows "can be manipulated with a pointer by employing some kind of pointing device," and describes "windowing-related actions" that include "resiz[ing]" and not "rotating."  Under the "popular operating systems" section of this Wikipedia entry, it lists MacOS, Windows, and other desktop platforms, but does not list mobile device operating systems like Apple iOS or Android.[5]  (*Id.*)  This aligns with the discussion of windows and operating systems that support them in the '765 specification, which uses the terms "window," "window size," "window state," "windowed applications,"  in a manner compatible with common understanding.

---

[5] MacOS is the current name for the OS X operating system that is listed in the '765 patent specification.

66.     Accordingly, I agree with Quibi's proposed construction.

**D.      "range" ('765 patent)**

| Term | Quibi's Construction | Eko's Construction in Joint Statement (Dkt. 355-1) |
|------|---------------------|--------------------------------------------------|
| "range" <br><br> '765 Patent, claims 1, 10 | "plurality of possible values between upper and lower limits" | Plain and ordinary meaning, which is "one or more values as to which variation is possible" |
| | | **Eko's Construction in Claim Construction Brief (Dkt. 435)** |
| | | Plain and ordinary meaning, which is "a set of possible values" |

67.     I understand that Quibi proposes that the term "range" should be construed to mean "plurality of possible values between upper and lower limits."  I also understand that Eko proposes that the term should be given its plain and ordinary meaning, which Eko now asserts is "a set of possible values."

68.     The '765 Patent requires a specific process for transitioning from the video from the first video presentation to the video from the second video presentation.  These limitations include "providing a mapping of video presentations to media player window height ranges and media player window width ranges," "determining that the second [height/width] is included in a particular one of the media player window [height/width] ranges," and "evaluating the mapping to determine that the second video presentation is mapped to both the particular media player window height range and the particular media player window width range."

69.     Quibi's proposed construction is supported by the claims and specification.  The specification uses the word "range" in only one paragraph.  ('765 patent, 5:65-6:23.)  The paragraph discussing "ranges" is the same one that

29

includes a table for possible heights and width ranges for "media player windows."
This paragraph expressly contrasts "fixed dimensions" with "ranges."  ('765 patent,
5:65-6:1 ("In some implementations, ***instead of*** limiting the windowed media
player 250 to ***fixed dimensions***, ***ranges*** for window heights and/or widths can be
defined and associated with differing media content." (emphasis added)).)  A "fixed
window dimension" has a "defined height and width" in which particular media
content (e.g., a video) is displayed.  (*Id.*, 5:57-58.)  "Ranges" are different from
this.  For "ranges," the height and width of any particular window "can be
individually resized to occupy between 5% and 100% of a screen," and "Table 1
indicates which of three different videos is presented depending on current window
dimensions"—in other words, the chosen video depends on the "range" into which
the window is resized.  (*Id.*, 6:1-5.)  These ranges are therefore a "plurality of
possible values between upper and lower limits," as Quibi's proposed construction
states.

70.    In Table 1, Video 1 is displayed in windows having heights between
5% and 50% and widths between 5% and 100% of the screen size.  Video 2 is
displayed in windows having heights between 50% and 100% and widths between
5% and 25% of the screen size.  Video 3 is displayed in windows having heights
between 50% and 100% and widths between 25% and 100% of the screen size.  A
range includes values between the percentages listed, which is why it says "50% **to**
100%" (emphasis added).

| TABLE 1 | | |
|---|---|---|
| Window Height Range | Window Width Range | Video |
| 5% to <50% | 5% to 100% | Video 1 |
| 50% to 100% | 5% to <25% | Video 2 |
| 50% to 100% | 25% to 100% | Video 3 |

71.     During prosecution, Eko's final amendments adding all the "media player window" limitations to the claims also added all the "range" limitations for the first time.  As explained above, Eko cited to Figure 3 when adding all of these "range" limitations during prosecution to overcome prior art Kasai.  Eko cited paragraphs [0032] and [0033], which correspond to the '765 patent at 5:57-6:13.  (Jacobs Ex. 1, EKO0001967-1968.)  This includes the range table pasted above, showing how the claims' "ranges" referred to the same ones in its specification.

72.     A POSITA would agree that the term "range" as used in the '765 patent is "a plurality of possible values between upper and lower limits," based on not only the plain meaning of range but also the meaning explained in the specification.  A POSITA would expect a media player window height "range" to include all possible values within which an actual measured height could fall.  The same is true for a media player width "range."

73.     Dictionary definitions also support Quibi's construction.  For example, the Microsoft Computer Dictionary, Fifth Edition, published in 2002, includes a definition of range as "the spread between specified low and high values."  (Jacobs Ex. 2, at QUIBI_0008822.)  This comports with Table 1 in the patent specification showing a spread between certain specified percentages in which the video presentation may fall.  Similarly, the Online Oxford English Dictionary includes such definitions of "range" as:

- "14a - The area or extent which a particular concept or thing covers or includes; the scope of something";

- "15b - A series or scale of values or degrees between particular upper and lower limits";

- "16a - The area over which the occurrence of a phenomenon, artefact, etc., is known or possible."

31

(Jacobs Ex. 8, at QUIBI_0008843, -8845, -8846.)  All of these definitions support Quibi's proposed construction, which specifies that a "range" is "a plurality of possible values between upper and lower limits."

74.     Eko construes "range" as "a set of possible values," which it takes from my previous declaration (Dkt 254-1, ¶ 71).  Dr. Chatterjee seems to suggest that this statement somehow means there are no upper or lower limits on that range.  (Chatterjee Decl., ¶¶ 40-41.)  He repeatedly cuts off my full statement, which was, "A person of ordinary skill in the art would expect a media player window height 'range' to include a set of possible values within which an actual measured height could fall. The same is true for a media player width 'range.'"  (Dkt 254-1, ¶ 71.)  I used "set" to refer to the plurality of all possible values, and not particular ones of them.  And my use of "within which an actual measured height [or width] could fall" expresses bounds for the values and is consistent with this declaration.

75.     Dr. Chatterjee criticizes Quibi's construction for excluding certain possible properties from the claim, such as device model and screen size.  (Chatterjee Decl., ¶¶ 43-44.)  Dr. Chatterjee argues that a POSITA would understand that a "media player window [height/width] range" could be expressed by model number, physical screen size, or some other property that has an indirect relationship to window size.[6]  His argument does not make sense for several reasons.

76.     First, the process of determining that a media player window has been resized within a certain height and width range must occur "*during playback* of the video from the first video presentation" ('765 patent, claim 1 (emphasis added)).  This is why the iOS Device Display Summary chart that Dr. Chatterjee includes,

---

[6] Dr. Chatterjee agrees that window size is the property of interest as the thing that is "resized" in '765 patent, claims 1 and 10. (Chatterjee Decl. ¶ 43 ("A person of ordinary skill in the art would have understood that each of these properties recited in claim 2 (or disclosed elsewhere in the specification) can correspond to ranges of window widths and heights.").)

with different models and native display resolutions, is irrelevant here.  (Chatterjee Decl., ¶ 44.)  One cannot start watching a first video and then transition to a second video based on a mid-video playback upgrade from an iPhone 6 to an iPhone 8.

77.    Second, claim 2, which lists the properties Dr. Chatterjee states a POSITA "would have understood . . . can correspond to ranges of window widths and heights" in claim 1, pertains to the "properties" in claim 1, not the "ranges." (Chatterjee, ¶ 43.)  The "properties" of claim 1 are mentioned only once, and are used solely for "configuring a first state of the video from the first video presentation."  ('765 patent, claim 1 ("configuring a first state of the video from the first video presentation based on at least one of the properties associated with the user device").)  The subsequent claim limitations pertain to resizing a media player window, evaluating whether the resized window falls within ranges, and transitioning to a "video from the second video presentation."  A POSITA would therefore not think that the "properties" of claim 2 have any relevance to the "ranges" of claim 1.

78.    Third, the properties that Dr. Chatterjee lists would not be understood by a POSITA to have an indirect relationship to window size.  This is because the iOS Device Display Summary chart refers to an iOS operating system, which is not a windowed operating system as described in the specification.  Each of these resolution and screen size values is distinct from a window filling a portion of the screen.  A POSITA would not consider the values "iPhone 8 Plus," "iPhone 7," or "iPad Air 2" to define a range of media player window heights or widths.

79.    Dr. Chatterjee's disagreement with the bounded nature of my construction ("between upper and lower limits") does not make sense.  Nothing in Dr. Chatterjee's declaration is actually inconsistent with the idea that a "range" is bounded by limits.  His car price examples have limits—$5,000 and $7,000 in one example, and $8,000 and $9,000 in the other.  (Chatterjee Decl. ¶¶ 46-47.)  Dr. Chatterjee's actual argument appears to be that a "range" can exclude possible

values between the limits.  But Table 1's repeated use of "to" between the limits (e.g., "50% to 100%") shows that the ranges cover all possible intermediate values.  Every "range" in Table 1 spans from a lower limit to an upper limit.  ('765 patent, 6:1-14.)

| TABLE 1 | | |
|---|---|---|
| Window Height Range | Window Width Range | Video |
| 5% to <50% | 5% to 100% | Video 1 |
| 50% to 100% | 5% to <25% | Video 2 |
| 50% to 100% | 25% to 100% | Video 3 |

80.    Dr. Chatterjee's car analogy is also flawed because even in the context of shopping for cars, $5000, $6000, and $7000 are specific prices of cars returned within a range—not ranges themselves.  (Chatterjee Decl. ¶ 46.)  For example, a car buyer using AutoTrader would be presented with the field below into which they could enter a price range.  Indeed, cars with a "plurality of possible values between upper and lower limits" of $5000 and $7000, respectively, would be returned in the search.  Of course, each car would not be a range of prices, but each car returned would have a price within the searched range.  The car price could be $5,001 or $6,342.23—any possible value between $5,000 and $7,000 limited only by the divisibility of a dollar.



81.     If Dr. Chatterjee thinks that my use of the word "set" could mean just one value, then I disagree and think that "range" as used in the '765 patent encompasses a plurality of values.  For this very reason, a POSITA would find that using Quibi's phrase "plurality of possible values" better describes the essence of a "range" than Eko's "set of possible values."

82.     In light of the foregoing, I agree with Quibi's proposed construction.

**E.     "segment" ('220 and '066 patents)**

| Term | Quibi's Construction | Eko's Construction in Joint Statement and Claim Construction Brief |
|------|---------------------|------------------------------------------------------------------|
| "segment"<br><br>'220 Patent, claims 1-2, 7-14, 19-21 | "standalone video" | Plain and ordinary meaning, which is "a portion of video and/or audio content" |

| '066 Patent, claims 1, 11 | | |
|---|---|---|

83.    I understand that Quibi proposes that the term "segment" should be construed to mean "standalone video." I also understand that Eko proposes that the term be given its plain and ordinary meaning, which Eko asserts is "a portion of video and/or audio content."

84.    I understand that Eko and Quibi agreed to construe the term "segment" across both patents as one of the nine chosen terms, and each proposed one consistent construction across both patents. Eko's '220 and '066 patents are directed to its choose-your-own-adventure narratives, in which segments branch off into selectable choices of subsequent segments that can be appended. Construing "segment" as "standalone video" accords with the language in the claims and specifications of Eko's patents.

85.    The '220 patent (whose application is incorporated by reference in the '066 patent) characterizes the word "segment" as "standalone video." The summary of the invention states, "A further object of the present invention is to provide systems and methods for loading videos where a plurality of videos is loaded, each having a plurality of *segments that are standalone videos*." ('220 patent at 1:61-64 (emphasis added); *see also id.* at 3:34-38 ("With the system of the present invention, a plurality of videos are loaded, each having a plurality of *segments that are a standalone video*" (emphasis added)).) In both of these sentences, the '220 patent directly refers to "the present invention."

86.    The '220 patent figures depict the standalone nature of Eko's segments and confirm the construction. Figure 4A, reproduced below, describes a loading sequence in which segments 1, 2a, 2b, and 3a-d are each unique videos that are loaded independently from one another. (*Id*. at 4:58-62.) The specification explains that "Segment 1 is loaded. Segments 2a, 2b are then loaded. The user

selects option 2b.  Segment 2a is then disregarded with its entire branch and segment 2b is loaded.  Segments 3c and 3d are also loaded." (*Id.*)



FIG. 4A

87.    Figures 3 through 10 depict the same selectable "segments of video that can be linked together via branches" (*id*. at 4:25-27).  Figure 3 "illustrates the differences between a regular video and one created by the present invention." (*Id.* at 4:40-43.)  In FIG. 3, the regular video is represented as a single linear video.  The video of the present invention, labeled "Interlude Video (with branches)" comprises a first standalone video starting on the left, i.e., a first segment, progressing in time to the right through branches to multiple alternative subsequent standalone videos, also segments.  (*Id*. at 4:43-49.)  Each of these standalone videos is a contiguous linear video of a certain length and is created by a "production company." (*Id.*, 3:42-43.)



FIG. 3

88.     In all of these figures, each of Eko's segments is a "standalone video" that can itself be progressively downloaded and/or played.  Although many of these figures display a half-downloaded or half-played segment, the specification does not describe the particular downloaded or played portion of each segment as itself a "segment."  The "regular video" of Figure 3 is *not* described as composed of Eko "segments," despite a portion of it being played and downloaded.  The patent also describes an embodiment in which "***only the start of*** each segment or selected segments are loaded."  (*Id*. at 5:53-67 (emphasis added).)  The "start of each segment," although it would fall within Eko's "portion of video and/or audio content" construction, is not a "segment."

89.     The rest of the '220 patent, including the claims, also support this construction of "segment" as a "standalone video."  The claims describe selectable segments that can be downloaded and viewed according to a download priority and can be appended onto one another based on the user's selection.  (*See, e.g.*, *id*. at claims 1-4, 7-16, 19-21.)  Nothing in the claims suggests that any portion of one of these "segments" is itself a segment.

90.     The "standalone video" construction from the '220 patent applies to the '066 patent as well.  The '066 patent incorporates by reference Application No. 13/437,164 (which later issued as the '220 patent).  ('066 patent at 6:2-11.)  The '066 patent also describes "selectably presentable multimedia content segments," in which "[e]ach content segment defines a portion of one or more content paths and includes a decision period during which a user may select a subsequent content segment as the content segment is playing."  ('066 patent, Abstract.)  The user selects multiple content segments to be seamlessly joined together in real-time.  (*Id*. at 1:50-65.)  "The transition to the next segment may occur immediately upon selection, at the end of the current segment, or at some other predefined point."  (*Id*. at 4:40-43.)

91.    The '066 patent incorporates by reference U.S patent application No.
13/033,916, which later issued as US Patent No. 9,607,655 (the "'916 application").
The '916 application describes segments in greater detail.  The '916 application
states that a segment may "refer to a pre-defined portion of a work or composition,
or an interval of either a defined or undefined period during a work or composition
that may be set off with a start time at a certain point during the composition, and/or
an end time during the composition, at which point another segment of the
composition may begin or at which point a non-segmented portion of the
composition may resume."  (Jacobs Ex. 5, '916 application, [0031].)  These
segments are frequently described as "pre-defined," "defined," or "known" portions
of a composition. (*See, e.g.*, *id*. at [0031], [0035], [0041]-[0044], [0057].)  The '916
application further states that any segment may "have pre-defined starting and/or
ending points at which each of such segment variations may be joined with one or
more other segments," just like the segments of the '220 and '066 patents.  (*Id*., at
[0057].)  Figures 6, 7, 8, and 9 of the '916 application also describe segments with
"pre-defined" start and/or end points.  One depiction of what the patentee means by
segments is in Figure 5, which shows how a user selects segments to progress from
scene to scene in the story of an interactive video:

FIG. 5

92. Thus, the '066 patent and the '916 application incorporated by reference into the '066 patent are consistent with the "standalone videos" definition used in the '220 patent (which is also incorporated by reference in the '066 patent).

93. Eko's proposed construction of "portions of video and/or audio content" would introduce further confusion to the claims rather than clarity. It is meaningless because all video contains "portions" of such video, so Eko's segments would therefore exist in all video content that has ever existed. Likewise, all audio contains "portions" of such audio, so Eko's segments would also exist in all music content that has ever existed. This cannot be the correct construction. The '220 patent states that "a production company 14 creates the segments of the video."

40

1    ('220 patent at 3:42-43.)  They are not just automatically-generated pieces of video

2    such as the chunks and fragments that are created to facilitate conventional adaptive

3    bitrate streaming.  Figure 5 of the '916 application reproduced above shows this:

4    for example, a segment showing a "lonely boy" is followed by a subsequent

5    segment that shows, for example, that "loneliness is sweet."  The interactive video

6    progresses through a series of scenes that constitute standalone videos.

7        94.    Dr. Chatterjee also asserts that that the use of the term "segment" in

8    conventional adaptive bitrate streaming standards like Apple's HTTP Live

9    Streaming (HLS) standard would inform a POSITA regarding its meaning in the

10   '220 and '066 patents.  (Chatterjee Decl., ¶ 56.)  I disagree that a POSITA would

11   view the "segments" in these patents as the same as "segments" in HLS or other

12   well-known adaptive bitrate streaming systems.  In adaptive bitrate streaming

13   systems, video is broken into temporal chunks that are each encoded at a plurality

14   of different resolutions and qualities that have different bitrates.  This allows a

15   client playback device to upshift or downshift the quality of the video displayed to

16   the viewer as needed, based on sudden changes in the speed of the viewer's Internet

17   connection.  A POSITA would understand a variety of terms to potentially refer to

18   these "chunks," including "chunks," "fragments," "subsegments," and also the term

19   to be construed here, "segments."  However, if a POSITA viewed the claims,

20   specification, and file histories of the '220 and '066 patents, this POSITA would

21   *not* consider the "segments" of the '220 and '066 patents to be the same as what are

22   sometimes called "segments" in the context of well-known adaptive bitrate

23   streaming systems.  The segments of the '220 and '066 patents relate to the creation

24   of an interactive story, whereas adaptive bitrate streaming segments relate to the

25   delivery of content over the Internet.  Transitions in the former follow a storyline

26   and are determined by viewers, whereas transitions in the latter are determined by

27   machines to optimize the quality of the video to be delivered according to a variety

28   of technical factors.

95.     Accordingly, I agree with Quibi's proposed construction of "segment" as "standalone video."

**F.     "collection of segments" ('220 patent)**

| Term | Quibi's Construction | Eko's Construction in Joint Statement and Claim Construction Brief |
|------|---------------------|-------------------------------------------------------------------|
| "collection of segments"<br><br>'220 Patent, claims 1-2, 13-14 | "a first segment of a video that is played and one or more subsequent segments" | Plain and ordinary meaning, which is "a collection of portions of video and/or audio content" |

96.     I understand Quibi proposes that the term "collection of segments" should be construed to mean "a first segment of a video that is played and one or more subsequent segments."  I also understand Eko proposes that the term be given its plain and ordinary meaning, which Eko asserts is "a collection of portions of video and/or audio content."

97.     Eko's proposed construction incorporates its proposed construction of "segment" into the term "collection of segments."  As I explained with respect to "segment," interpreting "segment" to be merely "a portion of video and/or audio content" is overly broad.  A POSITA would conclude the same with respect to the construction, "a collection of portions of video and/or audio content."  Like Eko's proposed construction for "segment," Eko's proposed construction here would introduce confusion rather than clarity.

98.     Quibi's proposed construction more closely aligns with the '220 patent's claims and specification than Eko's.  It incorporates Quibi's correct construction of the term "segment" (see above).  It also explains that the "collection of segments" encompasses segments that are appended onto one another in sequential fashion, and is not simply a loose, unorganized group of segments.  This

42

1    structure is required to present a choose-your-own-adventure style video to a

2    viewer.

3         99.    The '220 patent's specification supports Quibi's proposed

4    construction.  Of the 10 figures in the patent, Figures 3 through 10 show depictions

5    of segments.  They also each depict a "collection of segments" as "a first segment

6    of a video that is played" (colored red) and "one or more subsequent segments"

7    (colored green).  Figures 3 through 10 are reproduced, with annotations, below.

8    Describing the collection of segments in Figure 3, the specification refers to the

9    video highlighted in red as "the first segment."  ('220 patent at 4:44-45.)  Following

10   this "first segment," "a decision point exists . . . where it branches into two second

11   segments."  (*Id.* at 4:45-48.)  All the remaining Figures 4 through 10 depict this

12   same "non-linear" video structure comprising "segments connected by branches": a

13   first segment that is played, followed by subsequent segments.  (*Id.* at 3:47-49.)  A

14   POSITA would have understood these descriptions, together with Figures 3 through

15   10, to define a "collection of segments" as "a first segment that is played and one or

16   more subsequent segments."  No embodiment or drawing in the patent shows an

17   unorganized group of unconnected portions of video and/or audio content, which is

18   what Eko's construction proposes.  (Note:  In the composite figures below, I

19   excluded the linear "regular video" of Figure 3 that is not the subject of the "present

20   invention."  (*Id.* at 4:40-42.)

21

22

23

24

25

26

27

28





100.   Eko's proposed construction is incorrect.  For example, "a collection of portions of video and/or audio content" could include the linear "regular video" at the top of Figure 3 below, which is not the subject of the "present invention." (*Id*. at 4:40-42.)



**FIG. 3**

101.   Eko's proposed construction also contradicts the Court's ruling.  I understand that the Court has concluded that Quibi's stitched-together video cannot be "a collection of segments" where the "video comprises a single download or stream."  (Dkt 418 (PI Order) at 20-22.)  However, even a single download or stream of videos could qualify as a "collection of portions of video and/or audio content" and thus contain a "collection of segments" under Eko's construction. Under Quibi's construction, in contrast, "a collection of segments" excludes a single download or stream because it does not contain a first segment (i.e., a first standalone video) that is played and one or more subsequent segments (i.e., subsequent standalone videos), as the term "segment" is understood in Eko's patents (see "segment" above).

102.   Accordingly, I agree with Quibi's proposed construction.

1

### G.    "decision points" ('220 patent)

| Term | Quibi's Construction | Eko's Construction in Joint Statement (Dkt. 355-1) |
|------|---------------------|---------------------------------------------------|
| "decision points" '220 Patent, claims 2, 14 | Plain and ordinary meaning / no construction needed | "points within a series of video segments that the user may make a decision" |
| | | **Eko's Construction in Claim Construction Brief (Dkt. 435)** |
| | | Eko says the parties agree on plain and ordinary meaning. |

103.    I understand that Quibi proposes that the term "decision points" should be given its plain and ordinary meaning.  I also understand that Eko initially proposed that the term should be construed to mean "points within a series of video segments that the user may make a decision," but that Eko now agrees that it should be given its plain and ordinary meaning and that no construction is needed.

104.    I have been asked to opine on the plain and ordinary meaning of this term in the context of the claims and specification.  Claim 2 recites that the "collection of segments is organized according to a tree structure comprising decision points at which one of a plurality of segments may be selected for downloading and viewing . . . "  (*See* '220 patent at claims 2, 14.)  In the context of the relevant claims, the "decision point" is therefore defined in the claim itself.  It is a point at which one video segment is selected.  The specification mentions this "decision point" in only two instances.  The first is in a description of Figure 3, in which "[a] decision point exists after the first segment where it branches into two second segments with remaining video to download.  The remaining video to download branches from the respective two second segments."  (*Id.* at 4:45-49.) Figure 3, reproduced below, delineates where these decisions points are located

with two vertical lines across the "Time" arrow at the bottom.  (*Id.* at Fig. 3 (emphasis added).)



**FIG. 3**

105.   The second mention of "decision point" clarifies that a decision point "is not limited to a binary option.  The number of decision point options can be larger and a segment can continue to any number of presented options."  (*Id.* at 7:34-40.)

106.   The "decision points," then, are what they sound like: points in time at which a decision can or must be made—either by the user or by the system itself.  (*Id.* at 7:48-51 ("In most instances, the options are selected by the user.  However, in some circumstances the system 10 can select the options for the user."))  But a decision can be made only at, or with respect to, this point.  The decision point corresponds to the branch points in Figure 3—specific points in time.  The decisions are i) what to download and ii) what to view (or play back).  The decision point refers to this particular point in time where a playing segment (or potentially playable segment) ends, and two or more subsequent segments need to be downloaded in anticipation of one of them being played.

107.   Eko's proposed original construction—if it is what Eko still means by plain and ordinary meaning—is too broad.  By placing "decision points" somewhere within a "series of video segments" where "a user may make a

decision," Eko attempts to divorce the location of the decision points from the branches of the interactive video.  Under Eko's construction, decision points could instead be placed haphazardly throughout the video content, including in the middle of segments.  This is not how the patent characterizes decision points.

108.   Thus, a POSITA would understand that the plain and ordinary meaning of decision point is the "point" where the end of one segment and the start of a subsequent segment meet and at which, or with respect to which, the downloading and viewing decisions described above are made.

## H.   "content paths" ('066 patent)

| Term | Quibi's Construction | Eko's Construction in Joint Statement (Dkt. 355-1) |
|------|---------------------|-----------------------------------------------------|
| "content paths"<br><br>'066 Patent, claims 1, 11 | "selectable sequences of two or more multimedia content segments" | "multimedia presentations of content segments seamlessly joined together" |
| | | **Eko's Construction in Claim Construction Brief (Dkt. 435)** |
| | | "two or more multimedia content segments" |

109.   I understand Quibi proposes that the term "content paths" should be construed to mean "selectable sequences of two or more multimedia content segments."  I also understand that Eko now proposes that the term "content paths" should be construed to mean "two or more multimedia content segments."  Dr. Chatterjee does not opine on the '066 patent, so I respond instead to Eko's brief.

110.   Both Quibi's and Eko's proposed constructions correctly state that content paths consist of two or more multimedia content segments.  For several reasons, I agree that an essential part of the construction for this term is that there are "two or more" segments.  First, the specification contains an explicit statement to this effect: "Two or more combined segments form a seamless multimedia

content path." ('066 patent at 4:26-30; *see also id*. at 2:51-55 ("each content segment defining *a portion of* content paths") (emphasis added).)  The specification also goes on to disclose that media paths may have an "introduction segment" and a "final segment"—and in particular, that "the viewer is presented with other choices at other decision[] points, depending on which path of choices is followed. Ultimately, the viewer arrives at a final segment, having traversed a complete multimedia content path." (*Id.* at 4:52-53, 5:1-5.)  These characterizations, too, demonstrate that content paths contain two or more segments.

111.  Eko's construction, however, is incomplete and misses the "path" aspect of the term.  The word "path" conveys that the two or more segments have a certain structural relationship.  Not every group of two or more segments make a path.  For a "content path" to be created, a first segment would include a "decision period during which a user may select a subsequent content segment," and then a second segment would comprise a user-selected content segment; "each content segment defines a portion of one or more content paths."  (*Id.*, claim 1.)  Let's call the first segment A and the selected subsequent segment B.  A POSITA would understand that this interactive "selectably presentable multimedia content" (*id.* at 1:51) would include at least another segment C, which is not part of the content path, but which could have been chosen as an alternative to segment B during the decision period.  Thus, the sequence of segments A→B, or in the alternative segments A→C, form a content path.  On the other hand, segments B and C do not form a content path.  Two or more segments *in a sequence* gives effect to the word "path."  Quibi's construction clarifies that the segments of a content path are combined into this selectable sequence of two segments (A→B or A→C).



112.   Based on the teachings of the '066 patent, a POSITA would understand that a content path is a *selectable sequence*. (*Id.* at 4:52-53, 5:1-5; *see also id.* at 4:34-42 ("Traversal of the multimedia content along a content path may be performed by selecting among options that appear on and/or around the video while the video is playing.  The segment that is played after a currently playing segment is determined based on the option selected."); *id.* at 1:59-62.) Accordingly, segments are played one after another as they are selected by a user. (*Id.*; *see also id.* at 2:33-37 5:22-27; 3:30-37.)  The specification also allows for an automatic selection of a default segment in the event that the user does not make a selection during the decision period.  This, too, shows that segments are *selectable*, even if they are not selected by the user. [7]  That content segments—and by extension, content paths—are selectable is the very purpose of the '066 patent, which is to provide "systems and methods to synchronize audio for *selectably presentable media content segments* . . ." (*Id.* at 1:42-46 (emphasis added).)

113.   As stated earlier, the '066 patent incorporates by reference Eko's patent application number 13/033,916 (later issued as U.S. patent 9,607,655).  (*Id.* at 4:8-13.)  Like the '066 patent, the '916 application is directed to assembling audio and video segments of interactive videos.  (Jacobs Ex. 5 at Abstract, [0002].) The '916 application confirms that content paths—alluded to as "user path[s]" (*id.* at [0060])—consist of two or more segments and that they are selectable sequences.

---

[7] The '220 patent (incorporated by reference) also discusses how "[w]ith the present invention, the interactive nature of a video impacts the video's content and the user can control the video's path" because "every option changes something on the video content." ('220 patent, 7:41-44.)  Thus, selectability is an essential aspect of the content path.

114.   Figure 5 contains a visual depiction of possible paths through a media presentation.  Consider the various content paths evident in Figure 5.



FIG. 5

One possible content path is "Lonely Girl" → "Loneliness so become a nun" → "Girl finds a dog" → "Dogs cure loneliness."  (*Id.*, Fig. 5 (annotations added in gold and green).)  Each of the possible content paths are "selectable sequences of two or more multimedia content segments," in accordance with Quibi's proposed construction.

115.   Accordingly, I agree with Quibi's proposed construction.

1    I declare under penalty of perjury of the laws of the United States that the

2 foregoing is true and correct.

3    Executed on February 18, 2021 in Yorba Linda, California.

4

5                    

6           Jim C. Williams